Good morning everyone, welcome. Will the lawyers who will be arguing please identify themselves. Matthew Gallin for the plaintiff's defendant Donald Kaider and I'll call the defendant. Brian Harris for the attorney general. All right, again welcome to you both. Why don't we begin with the appellant's argument. Mr. Gallin. May it please the court, I'd like to reserve about five minutes of time for my rebuttal. The issue on this appeal is what it means for state law to affirmatively provide for legal alien eligibility as is required under 1621D's opt-out provision. Counsel, before you start I have one question that I would appreciate your comments on. As I understand it, the Federal Act was effected in 1996, is that right? Correct. And the state welfare legislation was effected in 2010. In determining the broad issue of affirmatively providing, can we take cognizance of the fact that the legislature was already aware of the previously enacted federal And so when it doesn't guard its language and its own provisions through the inclusion of words like all children, does that have more of an affirmative connotation than it might have had if the federal restrictive legislation did not already exist? I think we can say that they were cognizant of the federal law, although I don't know for certain about that. I would say, though, that Congress stated a way for the states to opt out and they were clear about that. Well, if the states were going to, if the states had an intention of providing, I'm not stating it in the negative, because right now I'm not at least debating or contesting your interpretation that the states, that merely showing a negative, an omission of the federal a statement of intent would not be sufficient. But doesn't the fact that the word all is used indicate an intent to override the federal restriction and comply with the savings provision in the federal act? It may indicate an intent. Again, I would argue, though, that what the legislature wanted to do or what they intended to do isn't a proper question. It's whether or not they complied with the federal law as required by the written language. And that goes back to my original question, whether the historiography of the two statutes will impact on the compliance with the definition of affirmatively providing. In other words, if, let's say, in an ordinary debate or dialogue, someone purports to tell you, illegal aliens shouldn't get these benefits, and you say, all children should get those benefits. And you respond, all children should. Doesn't the word all in that context constitute an affirmation, an affirmative provision? I don't think it does. I think to affirm that they are receiving benefits, the state law would need to assert that the benefits are going to be provided to illegal aliens. We're familiar with that case. We've all read it. We all know it's not binding, but we all understand that they have defined, and they're defining affirmative as express, basically. But let me ask you this. You have a situation where Congress could have said express, could have said specific, and for whatever reasons chose the word affirmative. And then you have a situation where the state legislature could have said expressly that we may be covering people who are in the country illegally, but instead said non-citizens not otherwise eligible, and delegated to the department the right or the power to include people who are not in the country legally. So it seems to me that both sides made decisions about the word choice, both the Congress and the state legislature. And wouldn't you say under these circumstances that at least, I know you say that it's not important what the legislature intended to do, that it's only what they did do. We can start at least with the baseline that they clearly intended to cover people who are not in the country illegally. Or excuse me, legally. I mean, I think there are a couple of points that I would respond with that. How about just answering that question before you do the other response? I mean, it's hard to know exactly what their intent was. One of the statutes, for example, the All Kids, came about in 2006. So now we're talking about ten years after the federal 1621 was passed. So I don't know. I can't say for certain what their intent was. And I think we get into this issue of trying to figure out what everybody intended to do. Well, isn't the delegation to the rulemaking authority of the department an assertion, using that word, that coverage for people in the country illegally is intended? I would respectfully say no, it's not. Why would they delegate them the authority to do something that they don't want done? Well, they delegated the authority to provide benefits for non-citizens. And there are a number of different legal classes of non-citizens or aliens that would fall under the category of non-citizens. And it's arguable that that's who they're referring to. And especially if you look at all the lists of legal aliens in all the different statutes that we're talking about, they're all different. In fact, supposing there would be a reason why a political body, a legislature, would not wish to blatantly use words such as illegal immigrants in the context of providing benefits, but nevertheless sought the provision of those benefits without creating the political dissension that might otherwise ensue if the language were totally exposed. Is that, then, in that context, would other words that technically, that are technically sufficient to provide for the savings that the federal statute allows not, could that be, then, a basis for an evaluation or characterization of the use of those words as being affirmative assertions? Or is the statute out to say that the legislature blasted out at all political costs or whatever, or else you will fail? The latter part of your question was exactly what I was going to say. I think that's exactly what the point of 1621D was. To dare legislators to actually say that? I wouldn't say dare, but I would say to use that language so the public is on notice about what's going on. Now, why didn't they say express? Why didn't they say specific? Because your argument is basically affirmative means express and affirmative means specific, but they, although there's a quote in legislative history from one representative that you mentioned, it's, so it was discussed, but they didn't use that. And it's a phrase that, it's a word that can really convey the meaning much more clearly than the word that they chose. I agree it would be clear if they had done that. They didn't. They used the word affirmatively, and affirmatively needs to have some sort of meaning. It needs to, it means, it has to do something more to the word provide than if the word affirmatively wasn't there to begin with. Because if you take the word affirmatively out, then the Attorney General's interpretation that as long as the law is used to all kids or all children. But that's not the only alternative in that context. The statute didn't have to use the word all or didn't have to refer to who are otherwise disqualified. It just could have made a rule that children under the ages of so and so who are, meet certain financial and economic and health criteria are subject to that assistance. Moreover, you have a situation where the second part, and nobody's really discussed this in the briefs. The second part of that statute that we're talking about really negates any statute passed by a state legislature prior to 1996 with possibly the thinking that when you pass these pieces of legislation, you weren't considering whether to cover aliens in the country illegally. Therefore, we're going to knock them off the book, and we are going to say you must pass new legislation with that in mind. With an affirmative statement that there is coverage for certain classes of people in the country illegally. And the question then is, having gotten that direction from the federal government, and having then passed new enabling legislation that says all children, is that not an affirmative statement? That they are complying with that statute and saying when I say all children, I mean simply all children. And you have told us that our previous enabling statutes have to be redone with this in mind, and in our responses we were saying all children. Isn't that an affirmative statement? I would say it's not. It's not an affirmative statement with respect to benefits for illegal aliens. Of course, passing a law I guess is an affirmative statement. But what we need to look at is whether it's an affirmative statement regarding illegal alien eligibility. And saying all kids is not. It's not an affirmative statement with respect to illegal alien eligibility. It's not a bold statement to be sure. The question is whether it's legally sufficient. Right. And I would argue it's not. And obviously that's what we're arguing. And we're talking a lot about what people and bodies meant to do and what they should have done and what they shouldn't have done. And I think when we look at it like that, we really need to come back to what the plain language is. And that's really the first step here. And the plain language requires that the law assert or some other synonym, specify, express, state, mention. I agree they're not all perfect synonyms. But it requires something a little more than what's being done here. All is universal. You want something specific. You're changing what Congress requested. All is universal. It is universal. And that's the state law aspect of it. But the federal law is requiring. Did they say specific or did they say affirmative? If you request affirmative and we and the state of Illinois makes it universal, isn't that sufficient? I would recognize, readily recognize that the state law is certainly broad enough to cover the legal elements. But again, I just don't think that's what the question is, what the relevant inquiry is. Sure, all is universal. And the state law uses all. It's definitely broad enough to cover illegal aliens. I don't think there's a dispute about that. But that's not what Congress wanted. Did they say specific? They didn't say specific, though. Correct. They did not say specific. They used the word affirmatively. And we're all left here trying to figure out exactly what that means. So we need to just look at how we go about defining what affirmatively does. As we've said in our brief, all the authority that's out there points to our position, that it needs to either serve or specify or express or state or something, particularly about illegal aliens or some other comparable phrase. It doesn't need to be illegal aliens. It just needs to be some comparable phrase. And I think the point is to put the public on notice that this is what's going on and to hold legislators accountable for that decision. It's obviously a controversial issue. And having legislators duck the issue by using sort of hazy language is exactly what 1621D set out to prevent. So they responded to hazy language with hazy language? Yes. Okay. So, I mean, and then they left it to courts to decide the meaning of the fuzziness on both sides. Because I think we can all agree that if they had expressly said express, then we wouldn't be having this argument. Correct. Well, you still would have an argument of conflict preemption. Let's not go there. Because why would there be conflict preemption if they specifically say, you can do this if you say you're doing it? If you really want to argue that point and use your time on that area, go ahead. I'm using it on the affirmative language. But I would say, and this came up a little bit earlier, that they delegated it to the rulemaking body. And, again, if you look at the plain language of the law, the 1621D, it says that it needs to be done by a state law. And we start off some of this dialogue by talking about how it's delegated to the administrative agencies. And I think that, although it seems like a technical violation, I think that's also important to consider. And that would provide an alternative grounds to find that the All Kids and Moms and Babies Program violate 1621D. Again, if you look clearly at the language, it says in 1621 it needs to be a state law. And if you look at the state laws, they talk about how the administrative bodies are going to be the determining factor on who's going to receive it. So what would be the, and I know that it's not the be-all and end-all or the linchpin in resolving this case, but what would be the intent of Congress in restricting the flow of such aid and yet authorizing it, if not to kind of honor, and I know this is almost an archaic phrase, Article 10, by letting the states do their own thing. Article 5 is the federal court and the 10th Amendment is state rights. I think, I'm sorry, are you finished? Yes. I think that they did want to let states make that decision, but ultimately there was an overarching objective to reduce the incentives for illegal immigrants to come to the United States. It would be very strange for Congress to state that we can be overridden only if you nail us to the wall. And what would be that purpose? That's neither fish nor phone. If they're really trying to stop creating an incentive, then why wouldn't they just prohibit it? Why would they give you the option? Is there another way to put it to question? Well, I understood, I guess, the question is, you know, why would they, if they're letting the states make the decision, why would it have to be done in such a precise manner? What direction would the choice of language used in the state legislation provide to Congress or to the federal government that would subserve its interest? To put the public on notice that this is what's going on with tax dollars. And I think Congress had an interest in making sure that when the states did this, that they had the right to do it, but they were adequately letting the public know what was going on. And what federal purpose does that serve? Well, I think it serves the purpose of restricting the incentive for illegal immigrants to. No, it's a dare, isn't it? I never thought of it like that. Think about it like that and tell me what you think it is. I think that they, if, I don't know if I used the word dare, but I understand your point. I guess to some degree, yes. My question, I think, is more acute by your distinction between the intention of our legislature versus its implementation. You say intention is not enough, that you have to implement it through the use of certain language. And what federal function that would serve or subserve to the federal statute is kind of mysterious to me. I'm not sure. I understand your question. I'm not sure. But all we can go on is what the plain language is. And the plain language used the word affirmatively and with respect to illegal alien eligibility. And that's what it wanted. Well, what incentive would the courts have to read your language, to read your interpretation, as requiring this explicit language if the interpretation that it needs to simply provide a clear indication of intent. Given that choice, what incentive would the courts have, obviously I'm talking about statutory or otherwise, to read it your way? I don't know if you want to look at it as incentive. We have a choice between the two, and you seem to be giving that to us. You're saying, well, you know, read it very conservatively. Well, why? In fact, I think the statute on statutes, and I think somewhere in the briefs I've seen, that the general principle would be to give it a liberal construction, if I might use that term. I guess I don't think that there is a choice here. The federal language used the word affirmatively. And all the authority that's out there that's addressed this issue uses the word either assert or specify or express or whatever those other words. Well, you know, you're talking about Rodriguez and Martinez, and there may have been a kind of a rush to judgment there, thinking that somehow there's a compelling force in reading the word affirmatively as being expressed, when, in fact, ordinarily affirmatively means make it clear that that's your intention. Well, I say that the word, we've defined the word assert a number of, sorry, affirmatively a number of times that use the word assert. But, you know, the Martinez decision, ironically, we're arguing what the state there argued, what the attorney general in that case argued, too. So, again, I don't know, you know, how hasty that decision was, but they did certainly a thorough analysis of what was out there and came to the conclusion that, in order to comply, you need to use, it needs to express the state or whatever language was they used. So, again, I look at what's out there. All the authority out there supports our position on this. If I'm not mistaken, the outcome in Martinez was favored the recipients. So, in that sense, it may have been a form of dictum or it might have been overture dictum. I didn't analyze it that closely. But its decision went the other way. That's always a factor to consider because courts can give away a lot if their decision is going the other way anyhow. They, I mean, that court analyzed the issue. They ruled in favor of the state there. The state made the argument that we're making here. We're both making the same arguments. To follow Martinez wouldn't require breaking any new ground on this issue. Well, except, as Justice Gordon was just saying, if it doesn't become crucial to the decision because they're going the way the recipients are in any event, the reason we have this theory of dictum and overture dictum is because we have to attach less significance to statements and opinions that are not crucial to the decision that is being made, partly because it may not have been looked at closely enough because it wasn't the basis of the decision in the first place. And as Justice Gordon pointed out, in the Martinez case, it clearly was not. They could accept the express meaning and still go exactly the way they were going to go otherwise. It would be more compelling authority, although still not binding on us, had that been a critical decision or a necessary decision in terms of the way they eventually came out. And we all understand that. Yeah, agreed. I would agree with that. All we can do is look at what's out there. There's not a whole lot of stuff out there on this. And this is obviously a decision that's out there. It's on point. It addressed very, very similar issues to the extent that it's not binding where there is some ambiguity, and you certainly argue that there is, then going to legislative history would be appropriate. And in this case, the legislative history supports our position as well, as well as the plain language and all the other, the Rodriguez and the Martinez decision that are out there. If Your Honors don't have anything else, I would reserve the remainder of my time for rebuttal. Thank you, Mr. Gallant. Thank you. Mr. Parrish. Thank you, Your Honors. Ryan Parrish, Assistant Attorney General on behalf of the Illinois Attorney General in this case. Let me start sort of in the middle of the analysis, because I think that much of the discussion was about what was Congress up to in passing Section 1621. And it's important to keep in mind that Section 1621 was not part of immigration reform. It was part of welfare reform. And in passing welfare reform, Congress was trying to make government, the provision of government benefits more cost effective. And while they may have perceived that providing benefits to unlawful and present aliens. Answer. Counsel, I'm sort of curious what permits us here or encourages us to look at the legislative history of the congressional legislation. I don't think you should be looking at the history in terms of the statements of the conference report, because I think the language is clear and plain on its face. Affirmative means positive. I don't think there's any real debate about this at that point. It doesn't require specific or express language. And language such as all children or certainly non-citizens not otherwise eligible is as affirmative as you can get. Do you think that courts can differ as to the interpretation of those words and still have those words remain unambiguous? Yes, I think that people can differ. I happen to agree with you. Being ambiguous is simply because you can look at alternative definitions. There has to be more uncertainty as to language. So I fundamentally disagree with some of the statements of the plaintiffs and the statements of some of the courts that the purpose of the statute was not to provide notice. It was not necessarily a dare, as Your Honor put it, to state legislatures. But it was an attempt to make state legislatures mindful of what they were doing, because as you pointed out, Justice Epstein, this statute was passed in 1996. So anything prior to that that might have inadvertently or could be by negative implication could have provided benefits to aliens was sort of out the door. So states could still affirmatively provide benefits to aliens. They just had to be mindful of what they were doing so that it fit within the context of welfare reform. And, again, other evidence of this fact is that Congress itself didn't borrow any benefits to unlawfully imprison aliens. They allowed immunizations. They allowed emergency care. They allowed treatment for communicable diseases. So Congress wasn't intent on banning all benefits. But they did want states to be mindful of what they were doing and be cost-effective. Yeah, but all of those benefits that are the exceptions that are actually specified within the Federal Act have a rationale that is pretty much apparent from the face of those exceptions. One is immunization, obviously. They were responding to certain human kinds of extreme manifestations of need, and in some instances responding to the possibility of other citizens or residents who are here legally being impacted if those symptoms were left untreated. But to that extent, it doesn't necessarily purport to go beyond that. I agree, Your Honor. And I think if you look at the Moms and Babies programs and the All Kids programs, it fits squarely within that congressional purpose. I mean, Moms and Babies provides prenatal care to mothers so that babies will be born healthy. I don't think there's any question that, you know, money is being spent on premature births or birth defects. And remember, the baby… I mean, we're still a civilized country to the extent that even with immigration restrictions being stressed, that emergency care on a human basis will still be provided. And if emergency care is provided, that involves a state expenditure… That's correct. …which the federal act may well have chosen to avert. Go ahead. That does involve a state expenditure, and the federal… Congress, you're correct, could have averted that, but they chose not to. And the same holds true not only for the Moms and Babies program. And remember, also keep in mind that a lot of the babies born are going to be American citizens when they're born. So what the state was doing in providing prenatal care for expectant mothers who are unlawfully present was in accord with welfare reform. But that doesn't apply to the all kids program. It doesn't apply to all kids, but I think you can say the same thing about providing welfare. Let me go back to the essence of where we're here, which is really a statutory interpretation. One of the arguments that is made by the appellants in their brief is that if you were to read affirmatively the way that you're suggesting it should be read, it would be superfluous. In other words, what would be the difference between 1621 saying, the state may provide an alien who's not lawfully present in the United States is eligible for state benefits, for which such alien would be otherwise ineligible under a certain section, if they affirmatively provide for such eligibility. You take out affirmatively from that and you have, they may do it if they provide for such eligibility. Affirmatively then under theories of statutory interpretation has to be given a meaning and it wouldn't be there without the intent to have it mean something. How would your interpretation make it anything but superfluous? Let me go to the All Kids Act. I don't mean to avoid your reference to this particular provision, but I think it's clearer in the All Kids Act. If you just took out the word all, they would certainly have a stronger argument that the legislature didn't affirmatively provide for all children. I mean, maybe the statutes, there are certain... So if the statute just said provide coverage to children and kids, would the result be different? They'd certainly have a stronger argument because then all you're talking about is the income eligibility requirements. Then you could say, well, all the legislature was doing here was providing for a class of children with eligibility requirements. They weren't really looking at... They weren't clearly expressing intent to cover everybody that was here. So I disagree that the term affirmatively is necessarily superfluous. Certainly not in every case. And so again, I mean... At this point, I don't really think there's any real disagreement here that express language is not necessarily required here. What's the statutory authority for the department's implementation of the Moms and Babies Program? The Moms and Babies Program... Let me kind of step back a little bit because a lot of these programs are often more or less labels for different levels of eligibility. They're almost sort of marketing tools. There's a general Medicaid program in Illinois. To supplement that, Illinois has passed the Children's Health Insurance Program. Medicaid provides benefits up to 133 percent. The Children's Health Insurance Program is 200 percent. And then all kids from 200 to 300 percent. So the Moms and Babies Program is an outgrowth of the CHIPS, the Children's Health Insurance Program. And that's covered under both 4.35 of the Public Aid Code and Section 1-11 of the Public Aid Code. And that's where the legislature has delegated the authority to the Department of Human Health and Family Services to provide benefits to children under 19. And that's where the statutory authority arises from. And could the department under that delegation make the determination that they weren't going to cover children who are in the country illegally? Yes, I think the statute actually gives them that discretion. It says that they may cover that. But again, that doesn't necessarily defeat the federal language or purpose of the statute. That allows states the discretion to decide how and when to provide benefits to unlawfully present aliens. And certainly the legislation knew how to delineate between lawful and unlawfully present aliens. And again, going back to Section 4.35, the immediately preceding Section 4.34 did specifically reference legal aliens. So again, I don't think there's any real question that the legislature intended to provide these benefits. The language they used complied with federal law. And it also complied with the overall purpose of the statute. Go ahead. The appellant is really not terribly interested in what the legislature knew but didn't do. They're interested in what the legislature knew and what they did do. In other words, simply omitting an additional exclusion as far as the appellant is concerned won't do it for you. Your Honor, correct. Again, the beginning of any statutory construction is legislative intent. We're not arguing that by negative implication. We're arguing that this is affirmative language and it's sufficiently affirmative to meet the federal requirements. May I ask this question? Is it necessary, in the context here is that the trial court found that there was not basically reasonable grounds for the suit and denied the right to or denied permission to file the proposed complaint. Isn't it possible for us to say that there are reasonable grounds for filing it without deciding the issue here about the meaning of the statute? I don't see how you could do that, Your Honor. Well, I mean, we're having a situation where we are arguing about the or you are arguing about the meaning of affirmative and if we were to decide that there is something to talk about there, wouldn't that be reasonable grounds to allow the lawsuit to go forward? It would be like analogous in a sense to the distinction between probable cause and reasonable doubt. Well, no, because in this case it's a case of statutory construction and this is what appellate courts do is construe statutes. I know what we do if it's before us and necessary to the decision, but where the standard that was applied below is a statement by the court that there are no reasonable grounds to allow the filing of the lawsuit and if there is a statement of lesser reach by the court at this stage, which would simply be, you know, you have a right to make that argument, isn't that something that could happen? You can certainly do that, but I feel like we'd be back at the same place. You'd still have to go back to the circuit court and argue. But the question is, is it our choice or within our authority at this point without such a determination below, although one is implicit, to one could say usurp the right of the trial court initially to make such a determination? I think it's in your authority, yes, absolutely in your authority to make the statutory construction and say there is no cause of action here because there is no statutory violation. Well, it would certainly make a lot of sense if there were issues of fact being determined for us to avoid it. On the other hand, where the issues are primarily issues of law, we may still have the option, but if we choose to interpret the issues of law, I'm really, this is a softball to you, but I really want to comment from your opponent. Is it that this is basically something that won't require any new evidence, but strictly statutory interpretation and legal research? Correct. That it could be done here and within our jurisdiction to do it here? Yes, correct. If the court has no other questions, I would just ask that the circuit court's decision be approved. Thank you very much. Mr. Galen, maybe you want to address that point to begin. Sure. The petition for leave was denied based on the reasonable grounds, and all that requires is that the complaint is neither frivolous nor malicious, and we would argue that based on what we've discussed here today, it's neither. Now, these are mostly issues of legal interpretation, but allowing the petitioner to What facts would have to be ascertained beyond that, what we have now? What the motivation for people who are using these programs are. People who are using the programs? Or what the motivation for people, illegal aliens who are using these programs, what the motivation was for coming to this country, what it is for So you're going to call illegal aliens to the witness stand and ask them why they came to the United States and see if any of them say because Illinois has this coverage for children? No, we're not going to do that. And I would agree that I would be surprised if you answered that any other way. And I would agree that it is mostly, at this point, really a legal issue, and it can be decided by your honors. But the standard to keep in mind for filing the petition is whether or not we have reasonable grounds, and that just requires whether or not the complaint is frivolous or malicious. But wouldn't the determination that you're reading the statute wrong and that affirmative does not mean expressive specific, but was satisfied by the language used by the legislature, be sufficient to deny the filing of the proposed complaint? Yes, I think it would be. A couple of other points. Throughout the argument, the Attorney General has really not provided a definition of affirmatively. Neither did Congress, incidentally. The only definition that they've really come up with is positive. And I would say that the definition of positive based on Well, positive is a mathematical term. Plus, as opposed to minus. That is a basic definition. If you want to carry it beyond that, it would have to depend on usage. But in terms of what it means is that it's a proton and not an electron. Positive has a number of definitions. I don't think that will be the basis of our decision, however you go. Positive has a number of definitions, but one of them from Halpert's columns is the following. Quote, explicitly stated, stipulated, or expressed. So if we're going to use the word positive, I don't think that helps the Attorney General's position at all. Well, it would be at best, or I shouldn't say at best, it would be minimally. An expression of intent. That it wants to reach out to that group. And I think that group would be not The group that would otherwise have been excluded, but for the expression of intent. I agree. I get it. It could be looked at. Well, that's even in common usage. You know, at least what you see portrayed in the movies or in the newsreels is that military people like to say affirmative, negative. Because it's a clear indication of yes or no. The issue, again, is affirmative with respect to a legal ally, not just affirmative with respect to a larger group. And that, frankly, as I think about it, and I am thinking about it as I'm talking, it seems more and more to militate towards being simply an expression of intent. Again, I don't think we can look at the intent. I think we need to look at how Congress required the opt-out provision to be satisfied. And here they required, not intent, but a firmer statement that a legal ally to some other comparable phrase would be eligible for benefits. Affirmative being yes, we want them. I would just say yes, we want them for a legal ally. One other brief point. The Attorney General mentioned that the Department had the ultimate ability to, the Department being the administrative agency, had the ultimate decision on whether or not to provide benefits to a legal ally, and that they could deny benefits if they wanted to. And, again, that violates what 1621 requires, which is the eligibility determination is being done by law and not by rule. But isn't the delegation of the authority to do it a statement that people in the country eligible for benefits? And it doesn't say, 1621 doesn't say that they have to say that they will be covered, but that they may be covered. And isn't that exactly the power that was delegated by the legislature to the Department, saying you may do this? One point on that is I'm not conceding that the law that delegates, it doesn't, it doesn't affirmatively provide, but assuming for the moment that you're saying it does, the law requires that the state, the federal law requires that the state law affirmatively provide for the legal ally in eligibility and not based on rule. Well, it would be rather exotic, to put it euphemistically, for the federal government to be concerned as to which branch of state government makes the decision as long as the federal government makes the decision as long as it is a legally binding decision under the laws of the state and under the constitutions that have to be satisfied. So whether a department that's quasi-executive or quasi-legal, or whether it's made by executive order of a governor versus a legislature, would not seem to be the kind of involvement that the federal government would be interested in. And frankly, I'm not sure that constitutionally they're entitled to have that. I would just go back to my previous point that the point of 1621D was to put the states, to have the states put the public on notice about that. And by allowing the administrative agencies to make those determinations, it's being slipped under the radar and not putting the public on notice about that. So both of you crawled back into legislative intent when it satisfies your rhetorical purposes. I don't mean that as a criticism, but just noting it, because you started off by saying we shouldn't look at the intent, we should only look at the language. And I stick to that. And I think if we look at the language, it doesn't affirmatively provide, but if we're going to look at the intent, then certainly that's the intent of that 1621D. But I would urge you, Your Honors, to look at the plain language and nothing more. Anything further, Mr. Gallagher? Nothing. I want to say that both sides have done just a splendid job with their briefs and their arguments. It's a very well-presented case, and we will take it under advisement and issue a ruling in due course. Thank you. I want to concur in that both the briefs and the oral arguments were at a very high level, and the court is great. Namaste.